My name is Bill Orme, and I am addressing the court in my private capacity as a member of the public, because I believe that this Chapter 11 proceeding concerns matters of public interest that are atypical of a commercial bankruptcy case, including public access to what should be public amenities in a publicly funded and maintained public park.

 As a neighborhood resident for more than 30 years, I was closely engaged with the park planning process and once the park was being built with the organization of public boating programs there. I was also an appointed member of the Brooklyn Bridge Park Community Advisory Council when the marina contract was first discussed and awarded by the Park Corporation a decade ago, chairing discussions about the RFP bids and plans.

I am also a co-founder of and remain an active volunteer in the nonprofit Brooklyn Bridge Park Boathouse free public kayaking program, which is operated independently by unpaid volunteers, without financial support from the Park Corporation or Park Conservancy. We buy and maintain our boats and equipment ourselves. More than six thousand people go kayaking with us every summer, the majority of them from our great home borough of Brooklyn, of all ages, and from every part of Brooklyn. And they don't pay a penny.

A petition from the Boathouse volunteers calling for a fresh look at the use and management of the marina facility has been endorsed by hundreds of local people who are regular visitors to the park and supporters of community boating programs:

https://www.change.org/p/make-the-brooklyn-bridge-park-marina-more-than-a-yacht-parking-lot-run-by-a-pe-firm?utm_medium=custom_url&utm_source=share_petition&recruited_by_id=eb8e01a0-a043-11ef-b98b-2d04a4b1977d

To quote from that petition:

> Park officials and nonprofit groups operating kayaking and sailing programs in the park originally sought to ensure that the marina would feature free or low-cost public boating activities as well as docking facilities for luxury yachts. Under the terms of the Park contract awarding the lease to build and run the new marina, the owner-operators agreed to provide a modest two percent of their annual gross revenues for "community boating programs," as well as a significant allocation of dock space, but neither the financial nor non-financial obligations were ever fulfilled. […]
>
> While the bankruptcy court process has a duty to look out for creditors and do its best to get stakeholders repaid, we believe the Park and local officials have an opportunity to leverage this legal process and potential future relationship with the marina's next owner to imagine something better and more community oriented in a collaborative way.

Financial records released in these bankruptcy proceedings show that this facility has been operating virtually rent-free for the past decade as an exclusive private marina for luxury yachts with an expensive members-only for-profit sailing club, without its originally promised budgetary support for and public access to free or affordable marina-subsidized 'community boating' activities.

The Brooklyn Bridge Park Corporation, a public entity, is by far the largest of the company's named creditors in the Chapter 11 proceedings, with acknowledged debts of more than $500,000 in unpaid lease fees, and total debts perhaps exceeding $800,000.

The original commitments from the marina contract bidders included financial support and publicly accessible dock space for free inexpensive sailing and kayaking programs. The company's contractually obligated contribution of two percent of gross revenue for low-cost or no-cost 'community boating programs' would have translated into upwards of $30,000 or $40,000 yearly, helping us pay for safety training for volunteers, and enabling us to expand our summer evening schedules and daytime youth programs and add more boats to our small kayak fleet.

The marina company publicized that 2% pledge in meetings with community groups and on its website and in statements to the local press. But it never followed through.

Those funds could have also provided further sailing training opportunities for the Brooklyn public high schools who learned basic sailing skills in the small plywood skiffs that they built during the school year with the nonprofit Brooklyn Boatworks. Instead, the park created an exclusive members-only sailing club aimed at affluent people with prior sailing experience who can afford to pay $2000 to $3000 for a summer membership.

There is no public access of any kind to the marina, a private facility in a public space.

The bankruptcy presents what may be a one-time opportunity to re-envision the marina facility's purpose and governance, putting a priority on public use and access. There has been almost no public discussion or media coverage of this issue, potentially leaving the marina's fate and future management and mission in the hands of the private investment firms that are submitting low 'stalking horse' bids for the marina's assets.

The bankruptcy filing confirmed a few things about the current marina operation:

1) The 'One15 Brooklyn Bridge Park Marina' company never honored its contractually obligated and publicly promoted commitment to provide both financial and in-kind support and significant dock space for free or low-cost public-access 'community boating' activities, such as youth sailing and kayaking instruction programs;

2) The wholly commercial private for-profit model for the Bridge Park marina, predicated on fees from transient megayachts and longer-term local dock tenants, was shown to be economically unsustainable,  in part because the marina, by design, for appropriate environmental reasons in a public park, lacks the fueling and sewage and provisioning facilities many boat owners say they need and expect in a commercial marina;

3) The Park Corporation generously agreed to forego its contractually stipulated $300,000 annually in lease fees when the marina company confronted unanticipated major repairs - such as the expensive replacement of its outer 'wave attenuating'  floating barrier-  and closures from the Covid pandemic. Yet when the marina resumed regular operations three summer seasons ago, it still didn't pay the Park, which is now by far the bankrupt marina company's largest creditor (the $516,000 listed as owed to the Park Corporation in the bankruptcy filing does not include $300,000 owed from the just-concluded 2024 season.)

4) Despite not receiving its anticipated $300,000 per annum from its marina lessee over the past decade, the Park Corporation's finances and operations were not significantly affected, as those marina revenues never would have represented more than a small fraction of the overall continuing income from commercial retail, office, hotel and residential properties and businesses which pay PILOT fees to the Park.  Manifestly, the Park Corporation didn't and doesn't need the income from a private marina, which is good, because the ten-year experience of this venture shows that a marina business in that space is unlikely ever to be profitably viable.  Nor is it an optimal use of a publicly maintained open waterfront space which should serve the general public.

Before the Chapter 11 process concludes, the Park Corporation should meet with area elected representatives and community stakeholders to consider alternative nonprofit structures for the management and perhaps physical reconfiguration of marina facilities.

We should prioritize public access and affordable public uses, as originally envisioned and stipulated in the Park's marina RFP. A good first step would be a public conversation about the marina's future convened by the Board of the Brooklyn Bridge Park Corporation.

And the Federal Bankruptcy Court, for its part, should take into account the interests of the thousands of members of the New York public who visit the park every day and deserve more free or low-cost boating opportunities. This is not just a private matter.

# # #

=
*Bill Orme*
*18 Cranberry Street*
*Brooklyn NY 11201*

bill.orme@gmail.com